**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| **CARLOS NIETO, individually and derivatively on behalf of YG HOTEL INVESTORS, LLC,** | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:26-cv-2026** |
| | ) | |
| **HANS L. GROTELUESCHEN,** | ) | |
| **YG HOTEL VENTURES, LLC, and** | ) | |
| **YG HOTEL INVESTORS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, CARLOS NIETO, ("Plaintiff" or "Nieto"), by and through his undersigned counsel, for his Complaint against Defendants HANS L. GROTELUESCHEN ("Grotelueschen"), YG HOTEL VENTURES, LLC, and YG HOTEL INVESTORS, LLC, alleges as follows:

### JURISDICTION AND VENUE

1) This Court has subject matter jurisdiction under 28 U.S.C. § 1331. Plaintiff brings claims under the federal Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1964. Plaintiff's Count I alleges violations of 18 U.S.C. § 1962(c) by Defendants, providing federal question jurisdiction. Additionally, Count II brings claims under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). The Court has supplemental jurisdiction over Plaintiff's related state-law claims (fraud, fraudulent concealment, breach of fiduciary duty, and conversion) pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy.

2) Venue is proper in the Central District of Illinois under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District. The Hyatt hotel project that is the subject of this dispute is located in Champaign, Illinois (Champaign County), which lies within this District. Defendant Grotelueschen conducted the relevant business in Champaign (including soliciting Plaintiff's investment and managing the project from Champaign). Additionally, the misappropriated funds were funneled into a venture (Carmon's Event Center) in this District. Venue is further proper under 18 U.S.C. § 1965(a) for the RICO claim, as Defendant Grotelueschen "resides, is found, has an agent, or transacts his affairs" in this District.

3) This action should be assigned to the Urbana Division, as the events took place primarily in Champaign County, Illinois.

<u>PARTIES</u>

4) CARLOS NIETO is an individual and a resident citizen of Illinois.  He is an investor and member of YG Hotel Investors, LLC and YG Hotel Ventures, LLC . Plaintiff was a minority equity owner in the Hyatt Place Champaign hotel project (through his membership interest in YG Hotel Investors, LLC and his membership interest in YG Hotel Ventures, LLC) and also a creditor of YG Hotel Investors, LLC by virtue of a $250,000 promissory note. Plaintiff brings this action in two capacities: (a) in his individual capacity to recover for injuries personal to him (such as money he loaned and lost due to Defendants' fraud), and (b) derivatively on behalf of YG Hotel Investors, LLC to redress injuries to the company (such as the diversion of the company's assets and damage to its business).

5) HANS L. GROTELUESCHEN is an individual residing in Illinois (upon information and belief, Champaign County). At all relevant times, Grotelueschen was the manager and

controlling person of YG Hotel Investors, LLC and its managing entity YG Hotel Ventures, LLC.

Grotelueschen personally orchestrated the wrongful acts described herein, including the

solicitation of Plaintiff's investments and the misappropriation of funds. Grotelueschen is sued

individually for his personal misconduct and, where applicable, as the person through whom the

defendant entities acted.

6)  YG HOTEL INVESTORS, LLC ("YG Investors" or the "Company") is an Illinois

limited liability company formed in 2011. It was the entity established to own and develop the

Hyatt Place hotel in Champaign, Illinois. At present, YG Investors is effectively defunct due to

the misconduct alleged in this case (the hotel project failed financially). YG Investors is named

as a Nominal Defendant for purposes of the derivative claims (Counts IV and V), as those claims

belong to the Company. To the extent necessary, YG Investors is also a party for certain contract

obligations (e.g., it is the obligor on the promissory note mentioned below). However, as to the

tort claims, YG Investors is essentially an injured party on whose behalf Plaintiff sues

derivatively.  At the time of the filing of this Complaint, YG Investors was not in good standing

with the Illinois Secretary of State due to its failure to file its annual report.

7)  YG HOTEL VENTURES, LLC ("YG Ventures") is an Illinois limited liability

company. YG Ventures was designated as the Manager of YG Hotel Investors, LLC under the

Company's operating agreement. It is controlled by Grotelueschen (through another entity,

Prairieview Park, LLC). YG Ventures is the vehicle through which Grotelueschen managed YG

Investors. It is named as a defendant to ensure complete relief, particularly on the contract and

fiduciary duty claims (since it may be a party to the Operating Agreement and bore management

responsibilities). All actions of YG Ventures described herein were taken at the direction of

Grotelueschen, who dominated and controlled YG Ventures at all relevant times.  At the time of

the filing of this Complaint, YG Ventures was not in good standing with the Illinois Secretary of State due to its failure to file its annual report.

## DERIVATIVE CLAIMS

8)  The claims being pursued by YG Hotel Investors, LLC in this Complaint are being made on a derivative basis.

9)  Pursuant to the requirements of Federal Rule of Civil Procedure Rule 23.1, the Plaintiff states the following:

a) During all events complained of herein, Nieto was the largest monetary investor of YG Hotel Investors, LLC.

b)  This lawsuit is not a collusive one to confer jurisdiction that the court would otherwise lack;

c)  This entity liquidated all of its assets and ceased operations.  There no active members or officers to manage the Company.  Additionally, the company has insufficient capital and human resources to pursue any claims it may have.

d) This closely held entity is at an impasse with Defendant, Hans Grotelueschen, on whether a claim should be pursued against him.  Thus, proceeding forward on a derivative basis is necessary.

e) As such, a derivative action may be only settled, voluntarily dismissed, or compromised on with the court's approval and Notice of a proposed settlement, voluntarily dismissal, or compromise must be given to members in the manner that the court orders.

## COMMON FACTS

10)  At all times relevant herein, Hans Grotelueschen owned, controlled and operated YG Financial Group, P.C. ("YG Financial").  Grotelueschen was a licensed Certified Public

Accountant from October 1, 2006 from September 30, 2009 in the State of Illinois.  YG

Financial was a service firm that provided tax, accounting, and financial advice to its customers.

11)  At all times relevant herein, Nieto was a client of YG Financial and relied on YG

Financial and Grotelueschen for sound tax, accounting, and financial advice and

recommendations.

12)  As a result of Nieto's relationship with Grotelueschen and YG Financial, at all times

relevant herein, Grotelueschen and YG Financial had a fiduciary relationship with Nieto to act in

Nieto's best interests.

13)  YG Financial Group, P.C. was dissolved by Grotelueschen on November 8, 2024.

14)  YG Hotel Investors, LLC was created to develop a Hyatt Place hotel at 217 N. Neil

Street in Champaign, Illinois. Hans L. Grotelueschen was the initiator of the project. He set up

YG Investors on October 20, 2011, initially as its sole member and manager. To manage the

venture and attract outside capital, Grotelueschen later organized YG Hotel Ventures, LLC to act

as the Managing Member (Manager) of YG Investors.  Under an Amended Operating Agreement

effective December 15, 2012, YG Ventures (and thus Grotelueschen) had broad authority to

conduct the company's affairs, but also clear obligations to act for the company's benefit and not

to engage in self-dealing.

15)  Grotelueschen solicited share sales from the public utilizing a private placement

memorandum.  In mid-2013, at the urging of Grotelueschen, Plaintiff, Nieto, became a

significant investor in the project. On or about November 14, 2013, Nieto and Grotelueschen

executed a Subscription Agreement to purchase 330,000 Class B units of YG Hotel Investors,

LLC at $10 per unit, equivalent to a $3,300,000 investment, a copy of which is attached hereto as

Exhibit "A".

16) Additionally, on or about November 22, 2013, Nieto and Grotelueschen executed an additional Subscription Agreement to purchase 33,000 Class B units of YG Hotel Investors, LLC for an additional $330,000.00, a copy of which is attached hereto as Exhibit B". Nieto provided his $3,630,000.00 contribution by cash and releasing and forgiving certain mortgage loans he had previously made to Grotelueschen's project. (Nieto had earlier loaned funds to finance the purchase and development of the hotel property, secured by mortgages on that property. In exchange for an equity stake, he forgave that debt.)

17) By this transaction, Nieto became a Class B member of YG Investors and one of its largest stakeholders. Grotelueschen (through YG Ventures) owed fiduciary duties to Nieto and the other members to manage the company's finances prudently and solely for the company's business.

18) The Operating Agreement of YG Hotel Investors, LLC held:

(a) The Manager (YG Ventures/Grotelueschen) has full authority to manage the business (Operating Agreement §4.1), but must do so "in good faith" and in the "best interests of the Company and its members".

(b) The Manager is explicitly prohibited from using company assets for personal gain or non-company purposes. Section 4.4 stated: "No Member shall make use of the funds or property of the Company for the Member's own benefit (except as expressly provided in this Agreement) or for any purpose other than the carrying on of the business of the Company." Grotelueschen, as a Member and the Manager, was bound by this.

(c) Certain major actions (like borrowing money beyond a threshold, or transactions with affiliates) required the consent of members, ensuring that Grotelueschen could not unilaterally take extraordinary actions outside the ordinary course.

(d) The agreement also incorporated fiduciary principles: the Manager must account to the Company for any benefit derived from use of Company property (id. §4.7) and remains liable for acts of "fraud, gross negligence, or willful misconduct," notwithstanding any general limitation of liability (id. §4.2(a)).

19) In sum, Grotelueschen had both broad power over the project's funds and strict duties to utilize those funds exclusively for the hotel project's benefit.

20) By late 2020, Grotelueschen reported that the Champaign Hyatt project was running out of money. Grotelueschen turned to Carlos Nieto and others for an emergency cash infusion. In early December 2020, Grotelueschen approached Nieto, explained that the project needed additional funding to "get over the hump," and requested a short-term loan of $250,000. Grotelueschen did not disclose any misuse of funds (see below); instead, he implied the need was due to legitimate project expenses. Relying on these representations and on his trust in Grotelueschen's stewardship, Nieto agreed.

21) On December 2, 2020, YG Hotel Investors, LLC (through Grotelueschen) executed a Demand Promissory Note in favor of Carlos Nieto for $250,000.00. The Note bore 15% annual interest and stated the principal and interest were payable "on demand" by Nieto. A true and accurate copy of said Note is attached hereto as Exhibit "C". Nieto wired $250,000 to the Company's account that day, expecting it to be used solely for the project and repaid once the hotel's cash flow improved. Unbeknownst to Nieto, however, the project's financial distress was largely self-inflicted by Grotelueschen, as detailed below.

22) Sometime in 2020, Grotelueschen began secretly diverting in excess of $1,000,000 from YG Hotel Investors, LLC to another venture he personally owned, known as Carmon's Event Center ("Carmon's"). Carmon's was a separate banquet/event facility in Champaign that

Grotelueschen was developing concurrently.  Using his control over YG Investors' bank accounts, Grotelueschen caused the hotel project's funds (comprising money invested by Nieto and others) to be transferred out of YG Investors and into accounts or expenses related to Carmon's.  Grotelueschen did not inform Plaintiff or other investors that project funds were being used for Carmon's. He also did not document these transfers as formal loans (no promissory note from Carmon's, no mortgage or collateral, no written consent). Instead, he internally recorded the transactions much later on YG Investors' books as an inter-company receivable (essentially a vague "IOU" from Carmon's or related entities to YG Investors). By 2021, this concealed receivable had grown to roughly $1,000,000. In effect, Grotelueschen siphoned off a sizable portion of Nieto's invested capital that should have been used for working capital for the Hyatt hotel and used it to build his personal event center.

23)  Additionally, Grotelueschen also began using the LLC's American Express credit card to pay for personal and other expenses unrelated to the LLC's hotel business.

24) This diversion of funds was wholly unauthorized:

(a)  The Operating Agreement's prohibition on using funds for non-company purposes (Section 4.4) squarely forbade such a transfer. Carmon's Event Center was not a project of YG Hotel Investors, LLC; it was a completely separate business owned by Grotelueschen. Using YG Investors' money to pay for Carmon's was beyond the company's purpose.

(b)  As a "Major Decision," any significant loan or transaction with an affiliate required member consent, which was never sought or given. If Grotelueschen had disclosed his intent to "invest" $1M of the hotel's money into Carmon's, Nieto would have emphatically refused.

(c)  Grotelueschen's actions constituted a breach of his fiduciary duty of loyalty. He took corporate assets for personal gain, creating a conflict of interest, and did so in secret.

(d)  By depriving YG Investors of $1M in cash, he severely undercapitalized the hotel project, directly harming the company and its members.

In short, Grotelueschen's $1M diversion was a grave breach of trust and contract, while undermining YG Investors' solvency.

25)  In an online meeting with investors dated March 10, 2023 ("2023 Investor Call"), Grotelueschen announced that 1st quarter of the year had been higher sales than any other.  He was asked about whether he could comment on the Carmon's project.  The moderator asked "Can you, Hans, comment on something that you did that is totally unrelated to this called the event space…"  Grotelueschen explained to investors that the project was unrelated to the hotel project, although the hotel might see increased business from it tangentially.  When asked if it had any common investors or owners with the hotel, he declared "No, it's a hundred percent mine." In the meeting's entirety, he failed to disclose that he had already secretly siphoned the money from the hotel project to it.  Financial Statements and other documents distributed for the call additionally made no mention of payments, transfers, or money owed from the event center.

26) Until caught by an accountant looking into where the funds had been appropriated to, Grotelueschen never disclosed to Plaintiff Nieto or other investors that he had siphoned money to Carmon's. Grotelueschen, in addition to the online investor meeting mentioned, provided periodic updates about the hotel project (e.g., budget reports, investor meetings or webinars) but conspicuously omitted any mention of the $1,000,000 receivable from Carmon's. Instead, Grotelueschen let Plaintiff and other investors believe that all prior invested money was tied up

in legitimate project costs for the Hyatt. This fraudulent concealment was intentional: Grotelueschen knew that revealing the Carmon's transfers would have caused immediate outrage and likely legal action from Plaintiff and other investors, and that Plaintiff would never throw good money after bad had he known the truth. Thus, Grotelueschen kept silent and continued to misrepresent the project's finances by omission.

27) The siphoning of $1M, combined with other factors, left the Hyatt project financially crippled. Without that money, the project could not pay contractors timely and fell behind on its bank loan.  In 2022, the principal lender declared a default. Ultimately, in late 2024, First Mid filed a foreclosure action against YG Hotel Investors, LLC (and guarantors, including Grotelueschen) in Champaign County Circuit Court to foreclose the mortgage on the hotel property. The foreclosure meant that the hotel would likely be lost and the investors wiped out. This was the culmination of the financial rot caused, in large part, by Grotelueschen's diversion of funds. Plaintiff's $3,630,000.00 of equity essentially became worthless, and his $250k loan went unpaid.

28)  In a second online meeting with investors on March 8, 2025 ("2025 Investor Call"), Grotelueschen admitted that he had used company funds to "help" Carmon's Event Center, despite having earlier represented in the 2023 Investor Call that the event center was outside of the scope of the hotel project owned by him only.  By then, Carmon's itself was struggling and did not repay anything. Thus, Plaintiff learned after the fact that a major cause of the hotel project's failure was Grotelueschen's misappropriation.  Grotelueschen described and admitted to the misappropriation.

29) Carmon's Event Center, the recipient of the misappropriated funds, opened in 2021 but was not financially successful. It, too, fell into default and foreclosure by late 2023.

Grotelueschen's gamble of using hotel funds to jump-start Carmon's did not pay off; it only resulted in two failing projects instead of one. Notably, during Carmon's operation, Grotelueschen engaged in further deceitful conduct: he took advance deposits from event customers (e.g., wedding parties) even while Carmon's was in foreclosure and unlikely to honor those events. This left many customers outraged ("a lot of angry brides," as described in an email to Plaintiff). While this detail is not directly part of Plaintiff's investment claim, it exemplifies Grotelueschen's pattern of dishonesty and misuse of funds across his ventures.

30) Grotelueschen's misconduct with the Hyatt project was not an isolated incident. In fact, he has been accused of engaging in a strikingly similar scheme of misappropriation and concealment in another context – a family trust for which he handled finances. Bonnie K. Stanton, as Trustee of Trust A and Trust B U/A DTD 12/17/2010 filed a lawsuit against Hans L. Grotelueschen (Champaign Co. Case No. 2025-CH-000008) (hereinafter the "Stanton Trust case") alleging that, between 2019 and 2024, Grotelueschen misappropriated over $1,145,000 from an LLC owned by the trust (201 W. University, LLC).  Its asserted that he wrote these checks to himself or for his benefit, and recorded those as a "Due from Beneficiary" (since Hans was also one of the beneficiaries of the trust). It further alleges Grotelueschen fraudulently concealed these withdrawals by providing the trustee with incomplete financial statements that failed to disclose the growing receivable from Hans. The trustee discovered the diversion only in 2024 after hiring a forensic accountant, finding that Hans had been siphoning money and hiding it off the books – a scheme uncannily similar to what happened with the Hyatt project funds. The Stanton Trust case also accuses Hans of continuing to withdraw money even after being asked to stop, evidencing willful misconduct.

31) The allegations in the Stanton Trust case bolster Plaintiff's claims here by showing a pattern of behavior by Grotelueschen: he consistently diverts funds under his control for personal use and conceals the truth from those to whom he owes a duty to report. The following table summarizes key parallels:

| Allegation in Stanton Trust Case | Legal Theory Implicated | Relevance to This Case |
|---|---|---|
| Hans allegedly diverted over $1.14 million from a trust-owned LLC for his personal benefit (2019–2024), without authorization. | Breach of Fiduciary Duty; Conversion of assets | Shows a pattern of large-scale misappropriation of funds entrusted to Hans. Likewise, Hans diverted ~$1.0 million from the Hyatt project's LLC (YG Investors) for personal use (Carmon's) without authorization. |
| Hans allegedly concealed these withdrawals by providing false/incomplete financial reports (omitting a "due from beneficiary" account where he parked the stolen funds). | Fraud; Fraudulent Concealment | Demonstrates Hans's practice of hiding unauthorized transactions from beneficiaries/investors. Similarly, Hans never disclosed the $1.0 million Carmon's diversion in any report to Plaintiff, fraudulently concealing it. |
| Even after the trustee demanded he stop (Mar. 2024), Hans allegedly kept siphoning money (over $66k more), until legal action commenced. | Willful & Wanton Misconduct; Intent (malice) | Indicates Hans's malicious intent and reckless disregard of his duties. In Plaintiff's case, Plaintiff's case, Hans persisted in not telling investors about the diversion, and would likely have continued his scheme had the project not collapsed. This supports claims for punitive damages and RICO continuity. |
| Hans's alleged concealment caused harm: the trust's property fell into tax delinquency and loan default, | Breach of Duty; Causation of Damages | Shows that non-disclosure of misappropriation directly leads to financial disaster by preventing timely |

| unbeknownst to the trustee until too late. | | intervention. In the Hyatt project, Hans's concealment led to default on the hotel's loan and foreclosure, as Plaintiff was kept in the dark and could not act sooner. |
| --- | --- | --- |

32) These striking parallels between Hans's treatment of the family trust and of YG Hotel Investors, LLC give rise to a powerful inference that Hans's conduct toward Plaintiff was not a one-time mistake but part of a broader pattern of fraudulent behavior. Hans has demonstrated a modus operandi: abuse a position of financial control to divert funds for himself, then cover it up with lies or omissions until confronted with irrefutable evidence. For the purposes of this case, the Stanton Trust allegations corroborate that Hans's failure to disclose the $1 million diversion to Carlos Nieto was deliberate and fraudulent. Hans knew exactly what he was doing and knew that it was wrong; he simply thought he could get away with it, as he had (temporarily) in the other instance. This pattern evidence will also be relevant to Plaintiff's RICO claim (showing continuity of racketeering activity) and to any consideration of punitive damages (showing intentional, repeated misconduct).

33) Plaintiff brings certain claims (notably breach of fiduciary duty and conversion) derivatively on behalf of YG Hotel Investors, LLC. Under 805 ILCS 180/40-1 and Fed. R. Civ. P. 23.1, Plaintiff must either make a demand on the LLC's managers to initiate action or plead why such demand would be futile. Here, any demand on the LLC's manager (Grotelueschen) to sue himself would clearly be futile. Grotelueschen is the primary wrongdoer and completely controlled the LLC; he is not going to cause the company to sue himself for his malfeasance. Indeed, Grotelueschen remained in control of the LLC up until its failure, and no other independent person could have acted on a demand. Plaintiff accordingly has standing to sue

derivatively. Plaintiff was a member of YG Investors at the time of the transactions in question (and continuously thereafter), and will fairly and adequately represent the interests of the LLC's members in enforcing the company's rights. YG Hotel Investors, LLC is named as a nominal defendant solely to ensure that any recovery for the derivative claims (Counts IV and V) inures to the benefit of the company.

34) In summary, Plaintiff Carlos Nieto invested and loaned millions of dollars for a hotel project that was supposed to succeed under Hans Grotelueschen's management. Instead, Grotelueschen looted the project of a huge sum, used it for an unrelated venture, and lied by omission to Plaintiff about it, thereby dooming the project and causing Plaintiff significant losses. Grotelueschen's actions were fraudulent, oppressive, and in blatant breach of his duties. This Complaint seeks to hold Grotelueschen (and his affiliated entities) accountable for this misconduct, to recover damages for Plaintiff and for the LLC, and to impose any appropriate equitable remedies and statutory penalties (such as RICO treble damages) so that Grotelueschen does not profit from his wrongdoing.

### COUNT I – Civil RICO (18 U.S.C. § 1962(c))
(Direct Claim Against Defendant Hans L. Grotelueschen and YG Hotel Ventures, LLC)

35) Plaintiff repeats and realleges Paragraphs 1 through 34 above as if fully set forth herein.

36) Defendant Hans L. Grotelueschen is a "person" capable of holding interest in property and therefore subject to civil RICO liability under 18 U.S.C. §§ 1961(3) and 1962(c). Defendant YG Hotel Ventures, LLC (through which Hans managed the project) is also a "person" for RICO purposes. The "enterprise" in this Count is YG Hotel Investors, LLC—an entity enterprise engaged in interstate commerce (the development of a national hotel franchisee

involving interstate suppliers, and attracting interstate guests qualifies as activity affecting interstate commerce. In the alternative or in addition, the enterprise may be described as an association-in-fact enterprise consisting of Grotelueschen and the various entities he utilized (YG Hotel Investors, YG Hotel Ventures, and Carmon's Event Center) functioning as a continuing unit with the common purpose of misappropriating and misusing investment funds. Regardless of how defined, at all relevant times there existed an enterprise (distinct from Grotelueschen individually) whose affairs were conducted through a pattern of racketeering as described below.

37) Grotelueschen has engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5). The pattern consists of multiple related acts of fraud, including acts indictable as mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343). Specifically, Grotelueschen committed at least two predicate acts (in fact, numerous acts) as part of a scheme to defraud Plaintiff and other investors:

a. On or about December 1–2, 2020, Grotelueschen and/or his agents sent interstate email(s) and engaged in phone communications with Plaintiff Nieto to solicit the $250,000 loan. In these communications, Grotelueschen represented that the project needed funds for legitimate purposes and omitted the material fact that he had diverted prior funds. The wiring of the $250,000 itself on Dec. 2, 2020 (from Plaintiff to the Company's bank in Illinois) was induced by this deception and constitutes an interstate wire transaction obtained by fraud. Each email or phone call around that time (Dec 1–2) that conveyed partial truths to Plaintiff was a separate predicate act of wire fraud, as Grotelueschen "devised a scheme or artifice to defraud" and transmitted communications by wire for the purpose of executing that scheme.

b. Throughout 2019 to 2023, Grotelueschen communicated with Plaintiff and other members by email, mail, and telephone to provide project updates, financial statements, and other information about YG Hotel Investors, LLC. In each of these communications, Grotelueschen knowingly omitted the material fact that company funds had been transferred to Carmon's Event Center. These omissions made his statements about the project misleading. For instance, in a March 2021 written update, Grotelueschen discussed the project's budget and needed funds without ever mentioning the Carmon's receivable—misrepresenting the true financial picture. Each such mailing or wiring of false or incomplete financial information constitutes a predicate act of mail or wire fraud.

c. Even after the project failed, Grotelueschen continued to mislead Plaintiff. In November 2023, when Plaintiff inquired about the $1M Carmon's receivable after finally seeing it, Grotelueschen responded (by email) with excuses and obfuscation, attempting to lull Plaintiff into believing it might still be repaid or that it was a sound "investment." These communications used interstate wires (email) and were part of the scheme to defraud by delaying legal action.

d)  The above are illustrative acts. Plaintiff will prove additional instances of wire fraud, including interstate communications related to Carmon's where project funds were discussed or moved.

38) The predicate acts identified are related to each other and amount to a continuous pattern. They all had the same purpose: to defraud Plaintiff and misappropriate his investments. They involved the same participant (Grotelueschen), the same victim or class of victims (Plaintiff and the LLC's investors), and the same mode of operation (withholding critical

information, making misleading communications to obtain or retain money). The acts span multiple years (2019 through at least 2023), satisfying the requirement of continuity. Indeed, Grotelueschen's scheme exhibits both "closed-ended" continuity (a series of related acts over a substantial period) and "open-ended" continuity (Grotelueschen's pattern of behavior threatens to continue or reoccur, as evidenced by his similar misconduct in other ventures like the Stanton Trust case, indicating a regular way of conducting business via fraud). Thus, Grotelueschen's conduct constitutes a pattern of racketeering activity.

39) Grotelueschen conducted and participated in the affairs of the enterprise (YG Hotel Investors, LLC) through the above pattern of racketeering. As Manager, he used his position within the enterprise to perpetrate the fraudulent scheme. The racketeering acts were not outside the enterprise; they were the means by which Grotelueschen managed the enterprise corruptly. For example, raising and handling funds are part of YG Investors' affairs, and Grotelueschen managed these affairs in a fraudulent manner (soliciting money by fraud, moving money by fraud). Thus, there is the requisite nexus between the pattern of racketeering and the enterprise's conduct.

40) Plaintiff Carlos Nieto has been injured in his business or property by reason of the above RICO violations. Specifically, Plaintiff lost $250,000 in property (the loan that has not been repaid) and suffered the devaluation of his $3,630,000.00 equity investment (effectively lost due to the project's collapse). These injuries were directly and proximately caused by Grotelueschen's racketeering acts. If Grotelueschen had not deceived Plaintiff and diverted the funds, Plaintiff would not have lost these monies (the project might have succeeded or Plaintiff would not have invested further). Plaintiff's injuries were a foreseeable consequence of the fraudulent scheme – indeed, the scheme was designed to extract money from Plaintiff (the

$250k) and to allow Grotelueschen to misuse Plaintiff's existing investment (causing its loss). There is a direct causal link: but for the wire fraud and mail fraud, Plaintiff would not have been harmed as he was.

41) Both Hans L. Grotelueschen and YG Hotel Ventures, LLC are liable under Count I. Grotelueschen is the primary wrongdoer. YG Hotel Ventures, LLC, as an entity through which Grotelueschen managed the LLC, participated in the scheme (to the extent its separate existence is recognized). All acts of Grotelueschen are imputed to YG Hotel Ventures, LLC. Accordingly, each is considered to have conducted the enterprise's affairs through the pattern of racketeering.

42) As a result of Defendants' violations of 18 U.S.C. § 1962(c), Plaintiff is entitled to recover treble his damages, plus costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c). Plaintiff's damages, prior to trebling, are believed to be at least $3,880,000 (comprised of the $250,000 loan and approximately $3,630,000.00 in lost equity value, or at least the portion of that equity rendered worthless by the scheme). The exact amount will be proven at trial. Trebling this amount yields damages in excess of $10 million. Additionally, Plaintiff seeks an award of reasonable attorneys' fees and costs incurred in prosecuting this claim, as permitted by RICO.

**COUNT II – Violation of Section 10(b) of the Securities Exchange Act and SEC Rule 10b-5**
**(Direct Claim Against Defendant Hans L. Grotelueschen)**

43) Plaintiff repeats and realleges paragraphs 1 through 34 above as though fully set forth herein.

44)  Plaintiff's December 2020 loan to YG Hotel Investors, LLC, evidenced by a Demand Promissory Note for $250,000 (the "Note"), was an investment contract and "security" within the meaning of the federal securities laws, including 15 U.S.C. § 78c(a)(10) & § 78c(a)(11). The Note had no fixed maturity date (due on demand) and carried a high interest rate (15% per

annum), indicating that it was an investment made with an expectation of profit (interest) to be generated by the efforts of the Company's management. Under the test set forth in *Reves v. Ernst & Young*, 494 U.S. 56 (1990), this Note is a security: it was issued in an investment context (to raise capital for the business), not as a routine commercial loan, and does not fall into any category of instrument excluded from the "note" definition of a security. Additionally, Plaintiff's membership units in YG Hotel Investors, LLC (purchased in 2013) are investment contracts and thus securities under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), as Plaintiff invested money in a common enterprise with an expectation of profits to be derived from the entrepreneurial efforts of Grotelueschen as manager. However, the primary focus of this Count is on the $250,000 Note transaction in 2020, which is clearly within the purview of the Exchange Act.

45)  In connection with the offer, purchase, and sale of the aforementioned securities, Defendant Hans L. Grotelueschen, directly or indirectly, made untrue statements of material fact and omitted to state material facts necessary to make his statements not misleading, in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5). Specifically, when soliciting Plaintiff's $250,000 investment/loan in late 2020, Grotelueschen misrepresented the financial needs and status of the project and omitted the critical fact that he was in the process of and intending of diverting Company funds to an unrelated project (Carmon's). Among the material facts concealed were: (a) the Company's cash shortage was largely going to be due to Grotelueschen's misappropriation, (b) that the Company's balance sheet would have a large, undisclosed receivable from Carmon's indicating misuse of funds, and (c) that the risk of default and project failure was much higher than represented because of this depletion of resources. The omission of these facts rendered Grotelueschen's positive assertions about the project's prospects and needs

misleading. Grotelueschen presented a materially false picture of the investment's risk and the use of Plaintiff's funds. These misrepresentations and omissions were made in documents and communications (such as the Demand Note and accompanying discussions) that were used to induce Plaintiff to purchase the Note (i.e., to invest the $250,000).

46) Grotelueschen acted with scienter, meaning he made the above misrepresentations and omissions knowingly or with reckless disregard for the truth. Grotelueschen knew of the intended diversion because he personally orchestrated it. He knew that failing to disclose it would deceive Plaintiff about the true projected financial condition of the Company. Grotelueschen's motive was clear: he wanted Plaintiff's $250,000 investment to fill the gap which would be due by his misappropriation, and he wanted to avoid accountability by keeping Plaintiff in the dark. At minimum, Grotelueschen was reckless in not informing Plaintiff of such a material issue. Given Grotelueschen's role as a sophisticated manager and the specific nature of the concealed information, there is compelling evidence of intentional deceit.

47) Plaintiff reasonably relied on Grotelueschen's statements and the integrity of the information provided when deciding to invest the additional $250,000. Plaintiff had no reason to suspect that Grotelueschen, as the long-time manager of the project, was concealing an intended misappropriation of that magnitude. Plaintiff relied on the (false) premise that the project's need for funds was genuine and not caused by misconduct. Plaintiff also relied on the expectation that there was no undisclosed misuse of his prior investments. If Plaintiff had been told the truth, Plaintiff would not have agreed to invest the additional $250,000 and might have pursued legal remedies or other actions at that time. Grotelueschen's deception thus directly influenced Plaintiff's investment decision. (Reliance is also presumed under the "fraud-on-the-investor"

doctrine for omissions in a transaction where the defendant had a duty to speak, which
Grotelueschen did due to their fiduciary relationship.)

48)  As a direct and proximate result of Grotelueschen's fraudulent conduct, Plaintiff has
suffered economic loss. Plaintiff's $250,000 investment is now effectively lost; the Note has not
been repaid and the Company is insolvent. In securities terms, the risk that was concealed
(misuse of funds) was the very risk that led to Plaintiff's loss (the project failing and the note
defaulting). Thus, Grotelueschen's misrepresentations and omissions were not only relevant at
the moment of investment, but they caused the ensuing damage by leading Plaintiff to invest in a
situation far riskier than he was led to believe.

49)  By virtue of the foregoing, Defendant Grotelueschen violated Section 10(b) of the
Exchange Act and Rule 10b-5. Specifically, Grotelueschen: (a) employed a device, scheme, or
artifice to defraud; (b) made untrue statements of material fact and omitted material facts
necessary to make statements not misleading; and (c) engaged in an act, practice, or course of
business which operated as a fraud or deceit upon Plaintiff in connection with the purchase of a
security (Plaintiff's $250,000 Note investment), all in violation of 17 C.F.R. § 240.10b-5
(Rule 10b-5 a, b, and c).

50)  As a result of Grotelueschen's violations of Section 10(b) and Rule 10b-5, Plaintiff is
entitled to rescission of the $250,000 Note transaction or, alternatively, compensatory damages.
Rescission would place Plaintiff in the position he was in prior to the investment, by returning to
him the $250,000 (with interest) in exchange for cancellation of the Note (which is essentially
worthless now). Alternatively, Plaintiff should be awarded damages equal to the difference
between the value of what he was promised and the value of what he received. Here, Plaintiff
received a Note that turned out to be uncollectible; its value was dramatically less than $250,000

due to the undisclosed risk. Damages are estimated at $250,000 plus prejudgment interest (and possibly the lost interest that was supposed to accrue). Plaintiff also seeks such other relief as may be available under the Exchange Act, including costs of suit.

### COUNT III – Fraud (Fraudulent Misrepresentation)
#### (Direct Claim Against Defendant Hans L. Grotelueschen)

51) Plaintiff repeats and realleges Paragraphs 1 through 34 above as if fully set forth herein.

52)  Defendant Grotelueschen engaged in fraudulent misrepresentations and omissions vis-à-vis Plaintiff. He made material false statements and concealed material facts with the intent to deceive Plaintiff, upon which Plaintiff relied to his detriment. In particular:

  a)  In late 2020, when soliciting the additional $250,000 loan, Grotelueschen represented to Plaintiff that the Hyatt project urgently needed funds due to project expenses and shortfalls, implying that all prior funds had been used for the project and that these funds would be as well. He portrayed the situation as a temporary cash crunch in an otherwise legitimate development. These representations were false by omission (see below) and gave a misleading impression that induced Plaintiff's loan.

  b)  False Financial Reporting:** Grotelueschen provided Plaintiff with financial updates that were falsified by omission—reports that did not list the use of the Carmon's funds, thereby affirmatively misrepresenting the company's assets and uses of cash.

53)  The facts misrepresented or omitted by Grotelueschen were material. A fact is material if a reasonable person would consider it important in making a decision. Here, any reasonable investor would want to know if the project's manager was taking $1M of the project's money for an unrelated venture. If Plaintiff had known that, he would not have made the $250k

loan and would have taken steps to safeguard his existing investment. The success or failure of

the project (and the risk to Plaintiff's money) was directly affected by whether that $1M was

available or gone. Thus, Grotelueschen's failure to disclose it was the concealment of a material

fact. Likewise, any misrepresentation that the project "needed money for cost overruns" was a

material falsehood. Plaintiff's actions (investing more money and refraining from legal action in

2020) demonstrate that he considered Hans's integrity and the project's financial state important;

had he known the truth, his actions would have been different.

54)  Plaintiff Carlos Nieto reasonably relied on Grotelueschen's representations and

omissions. Plaintiff had a longstanding relationship with Grotelueschen and had no reason at the

time to suspect egregious misconduct. Grotelueschen was the manager of the project and in a

fiduciary role; Plaintiff was entitled to assume Grotelueschen would honestly report material

issues. Plaintiff received financial statements and updates and trusted their accuracy. Moreover,

Grotelueschen's partial disclosure (saying "we need money" but not saying why) put Plaintiff in

a position of either trusting Hans or digging behind the statements—Plaintiff reasonably chose to

trust, especially given Hans's position. Plaintiff indeed relied on Hans's integrity when deciding

to provide the $250,000 loan. He relied on the implicit representation that prior funds had been

properly used and that this loan would genuinely help complete the project.  Therefore,

Plaintiff's reliance on the false picture painted by Hans was not only reasonable; it was actively

sought by Hans through his deceit.

55)  Grotelueschen's fraud caused Plaintiff to suffer damages. As a direct result of the

misrepresentations and concealment:

a)  Plaintiff provided $250,000 in December 2020 that he would not have provided had he known the truth. That amount is now lost or significantly at risk (the company has not repaid it).

b)  Plaintiff also refrained from taking protective measures with respect to his $3,630,000.00 equity investment. If he had known in 2020 of the projected diversion, he might have attempted to remove Grotelueschen as manager, enforce rights under the Operating Agreement, or even file suit or force a dissolution to salvage value. Instead, he continued to trust Grotelueschen until the collapse was irreversible. Thus, the value of Plaintiff's ownership interest was further diminished due to the delay caused by Hans's concealment.

c)  In monetary terms, Plaintiff's damages include at least the $250,000 principal of the loan (plus lost interest that would have accrued or been earned elsewhere), and the loss in value of his equity (which we quantify as, at minimum, the $1,000,000 that was siphoned away, because that is the portion of his investment definitively lost to misconduct—indeed the whole $3,630,000.00 was lost, Plaintiff's total fraud damages will be proven at trial, but they are expected to exceed $1,250,000.

d)  Plaintiff also has suffered consequential damages such as attorneys' fees to sort out the mess (which may be recoverable as damages for fraud in certain circumstances).

56)  The causal connection is clear: Plaintiff's losses stem from him acting (funding the project further, not suing earlier) based on false information. An argument that the project might have failed anyway does not break the chain of causation, because even if general market factors

affected the project, the specific additional losses (the $250k and extra collapse from undercapitalization) were caused by the fraud. But-for and proximate causation are satisfied.

57)  Grotelueschen's conduct was gross, malicious, and showed a willful indifference to Plaintiff's rights. This is not a garden-variety misrepresentation; it involves a fiduciary who deliberately plundered funds and lied to cover it up. As such, an award of punitive damages is warranted on this fraud count to punish Grotelueschen and to deter similar conduct by him or others. Plaintiff will seek a substantial punitive award commensurate with the gravity of the fraud (for example, a multiple of the actual damages). The pattern of Hans's behavior (including the similar trust fraud) shows this was not an isolated incident, underscoring the need for punitive damages.

### COUNT IV – Fraudulent Concealment
### (Direct Claim Against Defendant Hans L. Grotelueschen)

58) Plaintiff repeats and realleges Paragraphs 1 through 34 above as if fully set forth herein.

59)  By virtue of his position and relationship with Plaintiff, Defendant Grotelueschen had an affirmative duty to disclose material facts to Plaintiff. Grotelueschen was not a mere arms-length counterparty; he was the Manager of the LLC in which Plaintiff was a member, and their relationship was one of trust and confidence. Under Illinois law, a fiduciary (or one who has superior knowledge in a transaction) must disclose material facts to those entitled to know. Additionally, once Grotelueschen chose to speak about the project's finances (even in part), he had a duty to speak fully and not omit facts that would make his statements misleading. Thus, Grotelueschen had a duty to tell Plaintiff about the $1,000,000 transfer to Carmon's when

discussing the company's financial condition, especially when referencing the financial difficulties.

60)  Grotelueschen breached this duty by fraudulently concealing and suppressing the truth about the misappropriation. He remained silent and failed to inform Plaintiff of the Carmon's diversion at any time prior to discovery by the accountant investigating the situation. This concealment was active and intentional. It's not just that Grotelueschen "didn't mention it" – he took steps to hide it. For example, he provided financial updates that omitted the Carmon's receivable. He held meetings and never brought it up. These acts constitute fraudulent concealment because Grotelueschen knew the material fact (the $1M diversion), knew Plaintiff was unaware of it, and deliberately prevented Plaintiff and others from discovering it.

61)  Grotelueschen concealed the information with the intent to induce Plaintiff to act (or refrain from acting) in a manner favorable to Grotelueschen. By hiding the problem, Grotelueschen intended that Plaintiff would:

 a)  Continue to invest or loan money (which Plaintiff did, $250k).

 b)  Not object to or scrutinize Grotelueschen's conduct, thereby giving Grotelueschen free rein.

 c)  Not demand Grotelueschen's removal or the winding up of the LLC at a time when perhaps some capital could be saved.

62)  Plaintiff in fact was induced by this concealment. He reasonably relied on the assumption that no news was good news—i.e., that if a major unfavorable fact existed, Grotelueschen would tell him (as required). Plaintiff's reliance was manifested in the same ways described in the Fraud count: providing funds and not taking action, due to ignorance of the

truth. Hence, Grotelueschen's fraudulent concealment achieved its intended effect, at least until the scheme unraveled.

63)  The damages caused by the fraudulent concealment are coextensive with those outlined under Count III (Fraud). The concealment is essentially another angle of the fraud, focusing solely on the omitted information. Because of the concealment, Plaintiff suffered the loss of his $250,000 (which he would not have parted with had he known) and the loss in value of his equity (which he might have protected had he known earlier of the misappropriation). Additionally, Plaintiff and other members had to incur costs (like forensic accounting or legal fees to investigate what happened, once hints of it emerged). Under Illinois law, fraudulent concealment supports recovery of all proximate damages and potentially punitive damages given the willfulness. Plaintiff seeks the same compensatory damages here as in Count II, and also seeks punitive damages (which are particularly apt in a concealment scenario where defendant acted with malice).

64)  While the fraudulent concealment alleged here overlaps factually with the Fraud (misrepresentation) claim, Plaintiff pleads it as a separate cause of action to emphasize the breach of duty to disclose. Illinois recognizes fraudulent concealment as a variant of fraud when a duty to speak exists. To the extent it is distinct, all elements (duty, concealment, intent, reliance, damages) are satisfied.

65)  For the reasons already discussed, Grotelueschen's conduct in hiding the truth was egregious. He abused a fiduciary position to mislead those relying on him. Plaintiff requests that punitive damages be awarded on this Count as well, both to punish Grotelueschen for this malicious breach of trust and to deter any similar future conduct by him or others. (Plaintiff

acknowledges that he can recover only one set of punitive damages; punitive claims in Count III

and IV are pled in the alternative, covering both theories of fraud.

### COUNT V – Breach of Fiduciary Duty
(Derivative Claim on behalf of YG Hotel Investors, LLC, Against Hans L. Grotelueschen and
YG Hotel Ventures, LLC)

66) Plaintiff repeats and realleges Paragraphs 1 through 34 above as if fully set forth

herein.

67) As Manager of YG Hotel Investors, LLC (via YG Hotel Ventures, LLC), Hans L.

Grotelueschen owed fiduciary duties to the Company and its members. Under Illinois common

law, the manager of a manager-managed LLC owes duties akin to those a director/officer owes a

corporation and its shareholders. Additionally, the Operating Agreement of YG Investors

explicitly imposed duties: Grotelueschen was obligated to act in good faith, in the best interest of

the Company, and to refrain from self-dealing or misusing Company property (see Operating

Agreement §§ 4.4, 4.7, among others). As both a member and the controlling manager, and as

someone in sole control of the Company's finances, Grotelueschen had the duty of loyalty (to put

the Company's interests above his own), duty of care (to act prudently and diligently), and a duty

of candor (to disclose material facts to members). YG Hotel Ventures, LLC, as the named

Manager, shares in these duties, but it acted solely through Grotelueschen; thus references to

Grotelueschen's duties encompass YG Ventures' duties as well.

68)  Grotelueschen breached his duty of loyalty by diverting $1,000,000 of Company

funds to his personal venture (Carmon's) without authorization. This was self-dealing on its face:

he took a corporate opportunity (the use of money) and usurped it for himself. He dealt with the

Company's assets for his own benefit, which is a textbook breach of loyalty unless done in a fair

transaction with full disclosure and consent (which it was not). Furthermore, Grotelueschen

placed himself in a conflict of interest—helping Carmon's at the expense of the Company—and did so secretly, which aggravates the breach. By using Company funds "other than for the business of the Company" (contrary to OA §4.4), Grotelueschen violated a specific contractual duty as well as the general fiduciary duty of loyalty.

69) Grotelueschen also breached his duty of care (and acted with gross negligence or willful misconduct). No reasonably prudent manager would loan or give away $1,000,000 of the LLC's capital to an unproven side venture with no security or guarantee, especially when that capital was needed for the LLC's own project. This decision, aside from being self-interested, was extremely reckless and fell below any acceptable standard of care. It foreseeably left the Company underfunded and in peril. The fact that the project collapsed and creditors foreclosed is evidence of the harm caused. Additionally, failing to keep members informed and thus depriving the Company of potential corrective action (like bringing in new investors or cutting losses earlier) was a breach of care in managing the business.

70) Grotelueschen's concealment of material information (the Carmon's diversion, the dire financial straits) was a breach of his duty of good faith and candor. As a fiduciary, he was required to deal fairly and honestly with the members (and effectively with the Company). By withholding information, he prevented the Company (through its other stakeholders) from protecting itself. This lack of candor is itself a form of disloyalty and bad faith.

71) This claim is brought derivatively on behalf of YG Hotel Investors, LLC. The primary injury caused by Grotelueschen's breach was to the Company. The Company lost at least $1,000,000 in assets. Additionally, the Company's entire business was ruined, which is an injury to the entity (and indirectly to all members). All members suffered collectively in proportion to their ownership due to the loss of corporate assets and value, which is why the claim is

derivative. As alleged, demand on the Company to assert this claim was futile. Therefore, Plaintiff has standing to pursue this on the Company's behalf. YG Hotel Investors, LLC is realigned as a plaintiff for the purpose of this claim if necessary (though traditionally labeled a nominal defendant in the case caption).

72) As a direct and proximate result of Grotelueschen's breaches of fiduciary duty, YG Hotel Investors, LLC suffered substantial damages:

(a)  $1,000,000 (plus interest) that was diverted to Carmon's and not returned. This is money the Company should have on its balance sheet, but doesn't.

(b)  With that $1,000,000, the Company might have avoided default. The loss of it led to expensive consequences (loss of the hotel). The Company incurred additional debts and liabilities as a result.

(c)  Ultimately, the Company lost its primary asset (the hotel property) to foreclosure. The equity in that property was wiped out. The value of the enterprise went to zero (or negative). While some external factors contributed (like market conditions), we attribute a substantial causal portion to the lack of $1M that should have been there. In equity, Grotelueschen should bear the losses that his breach caused; any uncertainty in exact quantification will be resolved against the breaching fiduciary.

73) At minimum, the Company's measurable damages include the $1,000,000 misappropriated and the $250,000 that had to be borrowed (and still unpaid, which the Company owes to Plaintiff) as a direct result of the cash shortfall. So, $1.25 million plus interest is a floor for actual damages. The full damages could be the entire enterprise value lost. The exact sum can be determined with expert analysis of "but-for" scenarios (e.g., but for the diversion, would the

project have succeeded or had salvage value?). For pleading purposes, the Company's damages are well in excess of $1,000,000.

74) Plaintiff, on the Company's behalf, seeks the following relief for this count:

a) Payment by Grotelueschen (and YG Ventures, LLC jointly) to YG Hotel Investors, LLC of an amount sufficient to compensate the Company for its losses. This should include at least $1,000,000 (the diverted funds) plus interest (prejudgment interest from the dates of diversion, since the Company was deprived of use of its money). It may also include the $250,000 debt (if the Company must repay Plaintiff, then Grotelueschen should indemnify the Company for that). And potentially the loss of enterprise value—though by recovering the $1,000,000 and the note, the Company's estate might be somewhat restored (albeit the property is gone, but a judgment could substitute for it).

b) Because of the breach, the Court may impose a constructive trust over any assets in Grotelueschen's possession that are traceable to the misappropriated funds (e.g., if any part of Carmon's Event Center or its proceeds ended up with Grotelueschen, they should be held in trust for YG Investors). The Court may also order an accounting from Grotelueschen to determine exactly what he did with the $1,000,000 and any profits derived from it.

c) Illinois law, punitive damages can be awarded in a breach of fiduciary duty claim if the breach involves malice or gross indifference. Here, Grotelueschen's conduct (essentially stealing from the company) warrants punitive damages to the Company. Plaintiff seeks punitive damages on this claim to punish Grotelueschen's breach of trust. (In a derivative context, punitive damages recovered would belong to the Company but ultimately benefit the innocent members).

d)  Plaintiff succeeds in this derivative claim, the Court has equitable power to award Plaintiff's attorneys' fees out of any recovery (since his actions would have created a common benefit for the LLC and its members). While not a direct element of damages, Plaintiff notes his intent to seek fee shifting for the derivative benefit.

### COUNT VI – Breach of Fiduciary Duty
(Direct Claim Against Hans L. Grotelueschen)

75) Plaintiff repeats and realleges Paragraphs 1 through 34 above as if fully set forth herein.

76)  At all relevant times, Defendant Hans L. Grotelueschen was the principal and an accountant at YG Financial, P.C. In addition to serving as the manager of YG Hotel Investors, LLC, Grotelueschen also acted as Plaintiff, Carlos Nieto's, personal accountant and financial advisor.

77)  In this capacity, Grotelueschen and his firm prepared and reviewed Plaintiff's financial statements, advised Plaintiff on tax and investment matters, and had access to Plaintiff's confidential financial information. Plaintiff reasonably relied on Grotelueschen's professional expertise and trusted him to act with honesty, competence, and loyalty in all matters related to Plaintiff's finances.

78)  As Plaintiff's accountant, Grotelueschen owed Plaintiff a fiduciary duty under Illinois law. This duty included the obligation to act with the utmost good faith, to avoid conflicts of interest, to disclose material facts, and to refrain from self-dealing or using the client's information or trust for personal gain.

79)  Grotelueschen breached his fiduciary duty to Plaintiff in several ways:

a. He failed to disclose that he had diverted over $1,000,000 from YG Hotel Investors, LLC (an entity in which Plaintiff had invested $3,630,000.00 and to which he had loaned $250,000) to a separate venture he owned (Carmon's Event Center).

b. He failed to disclose that the financial distress of the Hyatt project was caused in part by his own misappropriation of funds.

c. He failed to advise Plaintiff of the material risks associated with further investment in the project, despite knowing that Plaintiff was relying on his professional advice and accounting oversight.

d. He used his position of trust as Plaintiff's accountant to lull Plaintiff into a false sense of security regarding the financial health of the project and the integrity of its management.

80) Grotelueschen exploited the relationship to further his own interests and conceal his misconduct.

81) As a direct and proximate result of Grotelueschen's breach of fiduciary duty as Plaintiff's accountant, Plaintiff suffered substantial damages, including but not limited to:

- The loss of $250,000 loaned to YG Hotel Investors, LLC in December 2020, which was induced by Grotelueschen's failure to disclose material facts and his misuse of Plaintiff's trust.

- The loss of Plaintiff's $3,630,000.00 equity investment, which was further imperiled by Plaintiff's reliance on Grotelueschen's advice and silence.

- Additional consequential damages, including legal and accounting fees incurred to investigate and respond to the misconduct.

82) Plaintiff seeks compensatory damages for these losses, as well as punitive damages for Grotelueschen's willful and malicious breach of his professional obligations. Plaintiff also seeks attorneys' fees and costs associated with this claim, and any other relief the Court deems just and proper.

### COUNT VII – Conversion
(Derivative Claim on behalf of YG Hotel Investors, LLC, Against Hans L. Grotelueschen)

83) Plaintiff repeats and realleges Paragraphs 1 through 34 above.

84) YG Hotel Investors, LLC had a clear right to and ownership of the funds contributed by its investors (including Plaintiff). Once Plaintiff and others invested or loaned money to the Company, those funds became the property of the Company, to be used only for Company purposes. The ~$1,000,000 that was in the Company's bank accounts (from capital contributions or loan advances) was an asset of YG Investors.

85) Grotelueschen, without authority, assumed control and dominion over approximately $1,000,000 of the Company's funds in a manner inconsistent with the Company's rights. Specifically, Grotelueschen caused the transfer of these funds to Carmon's Event Center (or related accounts under his control), thereby exercising control over the money as if it were his own. This taking was unauthorized because, as established, it was not for a Company purpose and was not approved by the Company's members or authorized by the Operating Agreement. By treating Company funds as a source of capital for Carmon's, Grotelueschen essentially "owned" or "used" the funds in a way that excluded the Company's rightful control.

86) Generally, for conversion, if the initial possession was lawful, demand and refusal are required. Here, Grotelueschen's initial possession of the funds was lawful (he had access as Manager), but his subsequent act of transferring them to an unauthorized use was itself a

wrongful taking. Nonetheless, even under a demand-and-refusal theory: The Company (through Plaintiff and/or other members) effectively demanded the return of the $1,000,000 once it was discovered. In the November 2023 timeframe, when Plaintiff confronted Grotelueschen about the $1M Carmon's receivable, that constituted a demand for an explanation and implicitly a return of the funds to the Company's coffers. Grotelueschen failed to restore any of the diverted money to the Company (and at this point, given Carmon's financial failure, has effectively refused or is unable to return it). Thus, even if a formal demand was conceptually needed, it either would be futile or has been effectively made and refused.

87)  Grotelueschen's exercise of control over the $1,000,000 was to the exclusion of the Company's rights. The Company has been permanently deprived of that money. It's not in any Company account earning interest or available for use; it's gone to Carmon's (and likely spent or lost). The Company's financial statements show that money as a receivable that hasn't been paid—meaning the Company cannot use it. This deprivation is the crux of conversion: Grotelueschen treated corporate funds as his own and, in doing so, denied the Company its property.

88)  The measure of damages for conversion is generally the value of the property at the time of conversion, plus interest. Here, that is approximately $1,000,000, valued at the time it was diverted (2020-2021). The Company is entitled to interest on that amount from the time of conversion (to compensate for loss of use). Because the exact dates of each transfer may vary, Plaintiff will seek interest from a reasonable median date or ask the trier of fact to include interest in any award. Additionally, if the property had any unique value or caused other loss, that could be considered; however, money is fungible, so $1,000,000 plus interest is straightforward.

Notably, conversion is a strict liability tort—good intentions (if any existed here) are no defense. But in this case, it was willful.

89)  This claim is brought derivatively on behalf of the Company because the Company was the entity that owned the funds. Plaintiff as an individual did not own the $1,000,000 once contributed; it became Company property. Therefore, the right to complain about its conversion belongs to the Company. As discussed, demand on the wrongdoer to sue himself is not required. YG Hotel Investors, LLC is the real party in interest and any recovery will belong to it. Plaintiff as a member seeks this recovery for the Company so that any remaining creditors can be paid and any residual value can be distributed to members (including Plaintiff).

90)  Plaintiff (derivatively for the Company) seeks a judgment for conversion against Grotelueschen in the amount of $1,000,000 (or such other exact amount as proven at trial to have been converted), plus prejudgment interest at the statutory rate (5% per annum under Illinois law, 815 ILCS 205/2) from the date of conversion(s). Moreover, because Grotelueschen's conversion was willful and malicious (it was essentially theft under the guise of authority), Plaintiff seeks punitive damages for conversion as well. Illinois law permits punitive damages in tort actions like conversion where the defendant's conduct is outrageous or shows reckless indifference to rights. Stealing company funds for personal use fits that description. An award of punitive damages to the Company is warranted to punish this conduct. Lastly, Plaintiff requests any equitable relief to aid in the remedy: for instance, if any of the converted funds can be traced into a specific asset (like a bank account), impose a constructive trust or order that asset sold to satisfy the judgment.

91)  By converting the Company's assets, Grotelueschen also effectively converted the economic value of Plaintiff's membership to the extent of Plaintiff's share of those assets.

However, to prevent double recovery, Plaintiff focuses this claim on the Company's rights. If, for any technical reason, the Company could not pursue conversion, Plaintiff would alternatively assert that Grotelueschen converted the portion of the funds that equitably belonged to Plaintiff (as a distribution or return of capital that should have come to him).

WHEREFORE, Plaintiff Carlos Nieto, individually and derivatively on behalf of YG Hotel Investors, LLC, prays for judgment in his favor and in favor of the Company, and against Defendants, jointly and severally where applicable, as follows:

a) An award of compensatory damages in an amount to be proven at trial, but no less than $3,630,000.00, to compensate Plaintiff and/or YG Hotel Investors, LLC for the losses caused by Defendants' unlawful conduct. This includes (1) $250,000 (with interest) for the unrepaid loan induced by fraud, (2) approximately $3,630,000.00 for the lost value of Plaintiff's equity investment, and (3) any other proven consequential damages such as lost profits or opportunity value of the funds.

b) On Count I, that the compensatory damages attributable to the RICO violation be trebled (tripled) pursuant to 18 U.S.C. § 1964(c). For example, if the jury finds $X of damages resulted from the pattern of racketeering, Plaintiff asks for judgment in the amount of 3×$X against the RICO defendants.

c) An award of punitive damages on the state-law claims (Counts III, IV, V, VI, VII) as permitted by law. Plaintiff requests punitive damages in an amount sufficient to punish Hans L. Grotelueschen for his willful, malicious conduct and to deter him and others from similar behavior. Given the magnitude of the harm and Hans's pattern of misconduct, Plaintiff suggests a punitive award on the order of several million dollars

(e.g., equal to or greater than the compensatory damages) subject to proof and the Court's determination of what is appropriate.

d)  Appropriate equitable relief to restore the status quo and prevent unjust enrichment by Defendants, including but not limited to:

e)  Imposition of a constructive trust on any assets of Hans L. Grotelueschen traceable to the funds taken from YG Hotel Investors, LLC (this could include assets of Carmon's Event Center or its holding entities, or any proceeds Hans received from Carmon's).

f)  An accounting by Grotelueschen of all funds of YG Hotel Investors, LLC that were transferred to himself or any entity under his control (including a detailed tracing of the $1,000,000 to Carmon's and how it was used).

g)  An order of disgorgement requiring Grotelueschen to disgorge any ill-gotten gains obtained from his breaches (for example, if he realized any personal profit or tax benefit from the diversion).

h)  Removal of Grotelueschen as Manager of YG Hotel Investors, LLC and YG Hotel Ventures, LLC (to the extent he remains in any position of control) and possibly an order barring him from managing any entity on behalf of Plaintiff or the Company in the future (though the project is defunct, this is to formalize that he should not be in charge of winding up affairs).

i)  Judicial dissolution of YG Hotel Investors, LLC and YG Hotel Ventures, LLC (if not already dissolved) under 805 ILCS 180/35-1, with appointment of a receiver to wind up the company's affairs. This receiver should pursue collection of the judgment in favor of the Company (Count V and VII damages) for the benefit of creditors and

members. (This relief is somewhat extraneous given the situation, but to the extent

needed, Plaintiff asks the Court to ensure the LLC's end is handled equitably.

j) An award of reasonable attorneys' fees and costs incurred by Plaintiff in this action, as

allowed by law:

(i) Under 18 U.S.C. § 1964(c), Plaintiff is entitled to attorney fees for the RICO

claim.

(ii)  Plaintiff also requests fees under the promissory note (if any clause provides

for fees) or under the Illinois Fraud Act if applicable (though not directly invoked, the

common law fraud is intertwined with a fiduciary context).

(iii)  In the alternative, for the derivative claims, Plaintiff asks the Court to award

fees out of any recovery obtained for the Company (common fund doctrine), as his

actions conferred a benefit on the Company and other members by holding the

wrongdoer accountable.

k) An award of pre-judgment interest on all applicable damages (for example, interest on

converted funds from the date of conversion, interest on the $250k loan from the date

of demand, etc.) to fully compensate Plaintiff and the Company.  And post-judgment

interest at the legal rate from the date of judgment until paid, pursuant to 28 U.S.C.

§ 1961.

l)  Any further relief the Court deems just and proper, whether at law or in equity. This

may include, for example, any appropriate declaratory relief finding that Defendants

violated the law and breached duties, which could be useful for issue preclusion in

related proceedings (such as the foreclosure or any bankruptcy of the entities). It also

includes leave for Plaintiff to amend the Complaint if additional wrongdoing is

discovered (for instance, if investigation reveals other funds missing or other victims of Hans's scheme who may join).

Dated: January 20, 2026.                    Respectfully submitted,


                                            /s/ Jason S. Bartell
                                            Jason S. Bartell, Esq.
                                            Bartell Powell LLP
                                            3015A Village Office Place
                                            Champaign, IL 61822
                                            (217) 352-5900
                                            jbartell@bartellpowell.com

                                            Attorneys for Plaintiff, Carlos Nieto